LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Ave., Suite 200
Anchorage, Alaska 99501
Tel: (907) 277-5400 • Fax: (907) 277-9896

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

ISABELLE HARRIS, as Personal )
Representative of the ESTATE )
OF TOMMY S. ADAMS, SR., )
                                 )
           Plaintiff, )
                                 )
vs. )
                                 )
BRUCE C. STOCKHOUSE, M.D.; )
JESSICA L. DIAB, M.D.; )
and CALVIN B. DAVIS, D.O., )
                                 )
           Defendants. )
_____) Case No. 3AN-18-04344 CI

## COMPLAINT

COMES plaintiff, through counsel, the law firm of Dillon & Findley P.C., and for its respective causes of action, alleges as follows:

1. Plaintiff Isabelle Harris, the personal representative of the Estate of Tommy S. Adams, Sr., brings this action on behalf of the Estate of Tommy S. Adams, Sr. Tommy S. Adams, Sr. was, during all relevant times, a resident of Anchorage, Alaska.

2. Defendant Bruce C. Stockhouse, M.D. is a medical doctor who is licensed by the State of Alaska and has been,

COMPLAINT
*Isabelle Harris, et al. v. Bruce C. Stockhouse, M.D., et al.*
Case No. 3AN-18-04344 CI
Page 1 of 11
Case 3:18-cv-00046-JWS Document 1-1 Filed 02/20/18 Page 1 of 11

during all relevant times alleged herein, a resident of Anchorage, Alaska.

3. Defendant Jessica L. Diab, M.D. is a medical doctor who is licensed by the State of Alaska and has been, during all relevant times alleged herein, a resident of Eagle River, Alaska.

4. Defendant Calvin B. Davis, D.O. is an osteopathic doctor who was engaged in the Alaska Family Medical Residency program sponsored by Providence Alaska Medical Center according to licensing by the State of Alaska and has been, during all relevant times alleged herein, a resident of Anchorage, Alaska.

5. Jurisdiction in this Court is proper under AS 22.10.020. Venue is proper under AS 22.10.030 and Alaska Rule of Civil Procedure 3.[1]

---

[1] This case involves care received at the Alaska Native Medical Center. It is likely that some if not all of the providers named were federal employees at the time of the care rendered to Mr. Adams and their care is governed by the Federal Torts Claims Act ("FTCA"). A proper administrative Form 95 has been filed to toll the statute of limitations for the federal action. However, federal case law does not protect the state statute of limitations for any healthcare provider who is not an employee of the federal government under the FTCA. Since there is no way to ensure that the healthcare providers who provided care to Mr. Adams were federal employees before the expiration of the state statute of limitations, this Complaint is necessary to require the United States Government to certify the status of each provider involved in his care.

COMPLAINT
*Isabelle Harris, et al. v. Bruce C. Stockhouse, M.D., et al.*
Case No. 3AN-18-_____ CI
Page 2 of 11

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Ave., Suite 200
Anchorage, Alaska 99501
Tel: (907) 277-5400 • Fax: (907) 277-9896

## FACTUAL BACKGROUND

6. On December 9, 2015, Tommy Adams, Sr. went to the Alaska Native Medical Center ("ANMC") Emergency Room with complaints of abdominal pain, shortness of breath and shaking that had begun the night before. Mr. Adams was evaluated by resident, Calvin Davis, D.O.

7. During Dr. Davis' evaluation, Mr. Adams' daughter explained that Mr. Adams also had a cough for two to three days, vomiting and a decreased appetite. Mr. Adams had a lapse in the administration of his Lasix (a diuretic) for about a week due to a pharmaceutical error, but had been taking it for the last five days.

8. Dr. Davis ordered laboratory studies, a chest x-ray, an electrocardiogram ("EKG"), and the administration of Lasix and oxygen.

9. Mr. Adams' laboratory results showed an elevated white blood cell ("WBC") count, an elevated Absolute Neutrophil ("ANC") count, low red blood cell count, elevated brain natriuretic protein ("BNP"), elevated blood urea nitrogen ("BUN"), and elevated lactic acid. His chest x-ray is described as showing hyperinflated lungs with bilateral patchy opacities.

COMPLAINT
*Isabelle Harris, et al. v. Bruce C. Stockhouse, M.D., et al.*
Case No. 3AN-18-_____ CI

10. Dr. Davis re-evaluated Mr. Adams and noted that he had improved after the administration of Lasix and oxygen. Dr. Davis discharged him with a diagnosis of shortness of breath, a prescription for an increase in his Lasix medication, and instructions to follow-up with his primary care provider in one to two days.

11. Later that day, there is an addendum to Mr. Adams' medical record made by the attending physician, Jessica Diab, M.D. Dr. Diab noted that she evaluated Mr. Adams and agreed with Dr. Davis' assessment and findings. Dr. Diab acknowledged Mr. Adams' elevated BNP and attributed it to his lapse in administration of Lasix and specifically stated that there is no evidence of pneumonia.

12. Neither Dr. Davis nor Dr. Diab discussed or explained Mr. Adams' elevated WBC, BUN or lactic acid.

13. As instructed by Dr. Davis, on December 11, 2015, Mr. Adams, along with his granddaughter, presented to his primary care provider, Bruce Stockhouse, M.D. Dr. Stockhouse is an Internal Medicine doctor at ANMC's primary care clinic.

14. Mr. Adams was still experiencing difficulty with breathing, decreased appetite and considerable weight loss.

15. After reviewing the emergency room record and obtaining a history and exam from Mr. Adams. Dr. Stockhouse

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Ave, Suite 200
Anchorage, Alaska 99501
Tel: (907) 277-5400 • Fax: (907) 277-9896

noted that Mr. Adams had crackles present, extending up further on the right side than on the left. Mr. Adams' oxygen saturation was noted at 92. Dr. Stockhouse attributed Mr. Adams' breathing troubles to congestive heart failure.

16. Despite being told that Mr. Adams had been on the increased diuretic prescription since his ER visit and that his breathing problems persisted, Dr. Stockhouse decided that the absence of the diuretic for a week precipitated his symptoms.

17. Dr. Stockhouse wondered if his aortic stenosis was worsening, leading to congestive heart failure.

18. Dr. Stockhouse ordered bloodwork, continued the increase in his Lasix medication, prescribed a nebulizer and suggested that he be evaluated in the ER if he experiences a significant worsening of his breathing. He also noted his plan to communicate with Mr. Adams' cardiologist to address his cardiac suspicions.

19. Mr. Adams' labs showed that his already elevated WBC had increased from 11.12 to 14.20, and his ANC had increased from 10.10 to 13.31, and his BUN increased from 43 mg to 72 mg since his visit to the ER. His lactic acid levels were not tested. Dr. Stockhouse also did not re-order Mr. Adams' BNP test.

20. Later that evening, Dr. Stockhouse sent an email to Dr. Peter Sapin, Mr. Adams' cardiologist, explaining that Mr. Adams had been off of his diuretic, had findings of progressive cardiomyopathy and bilateral opacifications on his chest x-ray in the ER, and that he had an elevated BNP (relying on the level from his ER visit). Dr. Stockhouse did not share Mr. Adams' lab results beyond Mr. Adams' BNP. Dr. Stockhouse reported the crackles and that Mr. Adams became easily dyspneic with movement.

21. Dr. Sapin responded the next morning. He noted that Mr. Adams' symptoms were probably from multivalve disease, but also told Dr. Stockhouse that Mr. Adams' aortic stenosis was not severe in February, and that his left ventricle ejection fraction would not progress to severe that fast. Dr. Sapin explained that a sooner cardiac visit may be wasted, but offered to see him before the 23rd.

22. Dr. Stockhouse's chart note and email to Dr. Sapin did not mention or explain Mr. Adams' other abnormal laboratory results from December 9th and 11th.

23. Two days later, Mr. Adams' daughter found him on the kitchen floor at his home and called 911. Mr. Adams had an altered mental status and was hypoxic.

24. After arriving by ambulance to the ER, a repeat chest x-ray showed dense consolidation in his left lung with possible pleural thickening or effusion. An ultrasound of his left chest showed bright lung markings consistent with pneumonia and he was started on antibiotics.

25. Mr. Adams was septic, in renal failure (believed to be due to dehydration), and had lactic acidosis. He was admitted to the hospital as a full code.

26. Mr. Adams battled the infection in the hospital until he was pronounced unresponsive at 5:30 a.m. on January 24, 2016. There was no autopsy performed. The cause of death on Mr. Adams' death certificate is severe "streptococcal pneumonia" leading to "perforated viscus (starrad)" and "multi-organ failure sepsis and cardiac arrest," which was the immediate cause of death.

## COUNT I – WRONGFUL DEATH

Plaintiff re-alleges paragraphs 1 through 26 as if fully set forth herein, and further alleges as follows:

27. Defendant Bruce C. Stockhouse, M.D. owed a duty to plaintiff Tommy Adams, Sr. to assess, diagnose and treat his existing condition with the degree of care and/or knowledge or skill possessed by or ordinarily exercised by medical doctors trained or experienced in the field of internal medicine.

28. Defendant Dr. Stockhouse either lacked the degree of knowledge or skill or failed to exercise the degree of care possessed by or ordinarily exercised by medical doctors trained or experienced in the field of internal medicine and was negligent and/or reckless in at least the following ways: failing to properly assess Mr. Adams' condition, failing to run the appropriate diagnostic tests, failing to properly diagnose Mr. Adams' condition, and failing to properly treat Mr. Adams' condition.

29. As a direct and proximate cause of negligent and/or reckless conduct as above alleged, Dr. Stockhouse caused Mr. Adams pain and suffering and death.

### COUNT II – WRONGFUL DEATH

Plaintiff re-alleges paragraphs 1 through 29 as if fully set forth herein, and further alleges as follows:

30. Defendant Jessica L. Diab, M.D. owed a duty to plaintiff Tommy Adams, Sr. to assess, diagnose and treat his existing condition with the degree of care and/or knowledge or skill possessed by or ordinarily exercised by medical doctors trained or experienced in the field of emergency medicine.

31. Defendant Dr. Diab either lacked the degree of knowledge or skill or failed to exercise the degree of care possessed by or ordinarily exercised by medical doctors trained

COMPLAINT
*Isabelle Harris, et al. v. Bruce C. Stockhouse, M.D., et al.*
Case No. 3AN-18-_____ CI
Page 8 of 11

or experienced in the field of emergency medicine and was negligent and/or reckless in at least the following ways: failing to properly assess Mr. Adams' condition, failing to run the appropriate diagnostic tests, failing to properly diagnose Mr. Adams' condition, and failing to properly treat Mr. Adams' condition.

32. As a direct and proximate cause of negligent and/or reckless conduct as above alleged, Dr. Diab caused Mr. Adams pain and suffering and death.

## COUNT III – WRONGFUL DEATH

Plaintiff re-alleges paragraphs 1 through 32 as if fully set forth herein, and further alleges as follows:

33. Defendant Calvin B. Davis, D.O. owed a duty to plaintiff Tommy Adams, Sr. to assess, diagnose and treat his existing condition with the degree of care and/or knowledge or skill possessed by or ordinarily exercised by medical doctors trained or experienced in the field of emergency medicine.

34. Defendant Dr. Davis either lacked the degree of knowledge or skill or failed to exercise the degree of care possessed by or ordinarily exercised by medical doctors trained or experienced in the field of emergency medicine and was negligent and/or reckless in at least the following ways: failing to properly assess Mr. Adams' condition, failing to run

the appropriate diagnostic tests, failing to properly diagnose Mr. Adams' condition, and failing to properly treat Mr. Adams' condition.

35. As a direct and proximate cause of negligent and/or reckless conduct as above alleged, Dr. Davis caused Mr. Adams pain and suffering and death.

## COUNT IV – *RESPONDEAT SUPERIOR*

Plaintiff re-alleges paragraphs 1 through 35 as if fully set forth herein, and further alleges as follows:

36. Alaska Native Medical Center[2] and Dr. Jessica Diab owed a duty to plaintiff Tommy Adams, Sr. to properly supervise, train, and/or oversee the treatment provided by Dr. Calvin Davis while acting as a resident at the Alaska Native Medical Center as either an employee, borrowed servant, dual employee or agent.

37. Alaska Native Medical Center and/or Dr. Diab failed to properly supervise, train and/or oversee the treatment provided by Dr. Davis. That failure proximately caused Mr. Adams' death.

---

[2] There is a pending Form 95 against Alaska Native Medical Center that encompasses this claim.

COMPLAINT
*Isabelle Harris, et al. v. Bruce C. Stockhouse, M.D., et al.*
Case No. 3AN-18-_____ CI
Page 10 of 11

WHEREFORE, plaintiff prays for relief as follows:

1. For compensatory damages, in excess of $100,000.00, the exact amount to be proven at trial, including, but not limited to, compensation for the wrongful death of Tommy S. Adams, Sr.; for economic and noneconomic losses to the Estate of Tommy S. Adams, Sr., including compensation for pain and suffering experienced, loss of services, and for loss of enjoyment of life;

2. For costs, attorney's fees, and pre-judgment interest; and

3. For such other and further relief as the Court deems just and proper.

DATED this 23rd day of January 2018, at Anchorage, Alaska.

DILLON & FINDLEY, P.C.
Attorneys for Plaintiff

By: _____
Margaret Simonian
ABA No. 9901001

COMPLAINT
*Isabelle Harris, et al. v. Bruce C. Stockhouse, M.D., et al.*
Case No. 3AN-18-_____ CI
Page 11 of 11